UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                        :

GLOBAL CROSSING ESTATE          :
REPRESENTATIVE,               :
                        :
             Plaintiff,       :
                        :       04 Civ. 2558 (GEL)
      -v-               :     —————
                        :     **OPINION AND ORDER**

GARY WINNICK, et al.,         :
                        :
           Defendants.    :
-------------------------------------------------------------x

Andrew J. Entwistle, Entwistle & Cappucci LLP, New York, NY (Harold F. McGuire, Jr., Arthur V. Nealon, and Helen Chung, Entwistle & Capucci LLP; Peter Morgenstern, Bragar Wexler Eagel & Morgenstern, LLP, New York, NY, on the brief), for plaintiff.

Gary O. Ravert, McDermott Will & Emery LLP, New York, NY (David C. Christian, McDermott Will & Emery, Chicago, IL; Gary M. Elden, Philip C. Stahl, George R. Dougherty, and Maile H. Solis, Grippo & Elden LLC, Chicago, IL, on the brief), for defendant Continental Casualty Co.

Anthony J. Trenga, Miller & Chevalier Chartered (Mark J. Rochon and Brian A. Hill, on the brief), for defendants ULLICO Inc. and MRCo. Inc.

Robert J. Ward, Mayer, Brown, Rowe & Maw LLP, New York, NY (Beth Ann Schultz, Mayer, Brown, Rowe & Maw LLP, on the brief), for defendants Canadian Imperial Bank of Commerce ("CIBC"), CIBC Wood Gundy, CIBC Oppenheimer, and CIBC World Markets.

GERARD E. LYNCH, <u>District Judge</u>:

The Global Crossing Ltd. Estate Representative ("Estate Representative") filed this action on behalf of now-bankrupt Global Crossing ("GC") against (1) Canadian Imperial Bank of Commerce ("CIBC"), CIBC Wood Gundy Capital (SFC) Inc. ("CIBC Wood Gundy"), CIBC Oppenheimer Corp. ("CIBC Oppenheimer"), and CIBC World Markets Corp. ("CIBC World Markets"); (2) ULLICO, Inc. ("ULLICO") and MRCo., Inc. ("MRCo."); and (3) Continental Casualty Company ("CCC"). It is alleged that prior to GC's bankruptcy, the defendants – who held GC stock, designated members to GC's board of directors, and/or provided certain financial services to GC – engaged in a multiyear campaign of insider selling of GC shares and improper self-dealing transactions that, among other things, drained GC of capital, leaving its creditors holding the bag. On the basis of this alleged conduct, the Consolidated Amended Complaint ("Compl." or "complaint")[1] advances three sets of claims: claims arising under federal bankruptcy law and state debtor law seeking a return of funds and property allegedly fraudulently transferred to defendants (Count 1); claims alleging that defendants, either directly or through the conduct of their board designees, violated (or aided and abetted violations of) fiduciary duties owed to GC, and seeking various forms of legal and equitable relief (Count 2-7); and a "corporate waste" claim arising under New York statutory law (Count 4). Defendants

---

[1] On January 27, 2004, the Estate Representative commenced an adversary proceeding in the bankruptcy court against, inter alia, CIBC and the ULLICO defendants. This Court withdrew the bankruptcy reference as to that proceeding (and subsequently, on June 3, 2005, the Estate Representative amended the complaint). On May 19, 2005, the Estate Representative commenced a separate adversary proceeding against CCC, CIBC Wood Gundy, CIBC Oppenheimer, and CIBC World Markets. On July 26, 2005, this Court withdrew the reference as to the May 19 proceeding; consolidated the January 27 and May 19 proceedings; and permitted the Estate Representative to file a consolidated amended complaint, which was subsequently filed. (Pl. Mem. 1 n.2.)

have now moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). For the following reasons, defendants' motions will be granted in part and denied in part.

## BACKGROUND

### I. The Parties

The plaintiff in this case is the GC Estate Representative, which was formed in the course of the bankruptcy proceedings of GC and numerous related entities (which commenced in 2002). (Compl. ¶ 9.) The Estate Representative – consisting of five individuals – was constituted to pursue claims belonging to the GC debtors for the benefit of their creditors, whose $6.2 billion in allowed claims "remain largely unsatisfied." (Id. ¶¶ 13-18.)

The defendants are former GC shareholders. The CIBC defendants – consisting of CIBC, a Canadian chartered bank, and various subsidiaries it "owned," "operated through," and "controlled" (id. ¶ 19) – were original GC investors who acquired over 48 million shares of GC stock as well as the right to name five members of the GC board, which during the relevant period had thirteen or more members.[2] (Id.) During the relevant period, it is alleged that the CIBC defendants sold over 28 million shares of GC stock for in excess of $2.4 billion. (Id.) In addition, they "provided commercial and investment banking services, underwriting services, and advisory services" to GC. (Id.)

---

[2] See Compl. ¶¶ 130-33 (noting GC's predecessor, GT Parent Holdings, LDC, had 13 board members; those directors subsequently became GC directors); Rodriguez Aff., Ex. A., Prospectus for 21,000,000 Shares of Global Crossing Ltd. Common Stock dated August 13, 1998 ("Prospectus"), at 55 (noting CG had sixteen board members as of August 1998); In re Global Crossing Secs. Litig., No. 02 Civ. 910, 2005 WL 2990646, at *1 n.3 (S.D.N.Y. Nov. 7, 2005) (noting GC 10-K's indicate seventeen members as of December 1998 and twenty members as of December 1999).

The ULLICO defendants – defendant ULLICO, a Washington D.C.-based financial services company, and its wholly-owned subsidiary MRCo. – are also GC stockholders and had one seat on the GC board. (<u>Id</u>. ¶¶ 20-22.) The complaint alleges that the ULLICO defendants made over $200 million in two stock sales during the relevant period. (<u>Id</u>.) CCC, a wholly owned subsidiary of CNA Financial Corp. (which is in turn 85% owned by the Loews Corporation), was also a GC shareholder with one seat on the board, and is alleged to have made over $1.7 billion in stock sales during the relevant period. (<u>Id</u>. ¶ 23.)

II.    <u>Factual Summary</u>

The complex allegations of the complaint are summarized in plaintiff's opposition memorandum: In 1997, defendants invested in a company named GT Parent Holdings, LDC ("GT Parent"), and obtained seats on GT Parent's 13-member board (5 for the CIBC defendants, 1 for the ULLICO defendants, 1 for CCC). (Pl. Mem. 2-3.) From 1997 to early 1998, GT Parent, through its subsidiaries, began to develop the Global Crossing fiber optic cable network, (<u>id</u>.), and in March 1998, GT Parent formed GC "to assume all its functions and assets." (<u>Id</u>. 3.) The GT Parent directors became GC directors, and the GT Parent shareholders, with the exception of the CIBC defendants, exchanged their GT Parent shares for GC shares. (<u>Id</u>.) The CIBC defendants became the sole owner of GT Parent, which itself held 26.5% of GC's stock: in effect, the CIBC defendants used GT Parent as an intermediary to hold its GC stock, and the complaint alleges that, in fact, GT Parent had no function other than that. (Pl. Mem. 3; Compl. ¶ 148.)

In August 1998, just before GC's IPO, GC issued 7 million restricted shares to various managers, the CIBC defendants, and the ULLICO defendants. That stock was issued to buy out

4

rights which early GT Parent investors had secured under so-called "Advisory Service Agreements," which plaintiff claims were "vehicles under which these insider[3] shareholders, acting through their designees on the GT Parent board of directors," obtained the right to a share of a small percentage (2%) of GC's revenues over a 25-year period. (Pl. Mem. 3-4.) Plaintiff attacks both the issuance of the ASAs by GT Parent, and the buyout of those agreements by GC, among other transactions, "as voidable transfers spawned by directorial breaches of fiduciary duty to [GC] and its creditors." (Id.) Upon completion of GC's IPO a few days later, plaintiff claims that corporate insiders, including defendants, were left with 88% of GC's 201.9 million outstanding shares, with the CIBC defendants holding 48.5 million, CCC holding 21.3 million, and the ULLICO defendants holding 16.9 million. (Id. 4.)

During this time, plaintiff claims that GC's revenue, and thus its stock price, became progressively (artificially) inflated due to accounting improprieties at GC concerning sales and swaps of internet bandwidth (which the Court has previously discussed at length[4]). The complaint alleges that defendants, who along with other corporate insiders controlled the GC board, were well aware of GC's misstated financials and exploited GC's inflated stock price in a series of self-dealing stock transactions. (Compl. ¶¶ 2-5, 54.) For instance, plaintiff claims that in May 1999, the insider-controlled board approved a merger with US West that included a

---

[3] Other than the CIBC defendants, the ULLICO defendants, CCC, and their respective board designees, the "insiders" referred to by the complaint include Gary Winnick, founder of GC, member of the GC board, and principal of Pacific Capital Group, Inc. ("PGC"), PGC itself, and certain related entities and individuals. Plaintiff has settled any potential claims against these entities and individuals. (Pl. Mem. 2 n.3.)

[4] See, e.g., In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319 (S.D.N.Y. 2004); In re Global Crossing, Ltd. Secs. Litig., 313 F. Supp. 2d 189 (S.D.N.Y. 2003).

tender offer to GC's shareholders at a premium over the stock's all-time high trading price, the principal benefit going to the insiders since they held most of GC's outstanding stock. Plaintiff claims that defendants themselves realized nearly $1 billion on this transaction. Plaintiff claims that the deal could, and should, have been structured so that the principal benefit of the takeover would go to the corporate treasury, as opposed to the shareholders, especially considering the high amount of debt – over $3.6 billion – that GC was incurring at the time. (Pl. Mem. 6-7.) Further, when Qwest Communications entered the picture with an alternative merger proposal that US West was legally required to consider, and ultimately did take, the GC board passed up an opportunity to terminate the US West merger agreement early and secure an $850 million breakup fee for GC, and instead negotiated a deal with US West and Qwest whereby the tender offer still went through, and the breakup fee was reduced from $850 million to $210 million. (Id. 7-8.) The complaint "seeks to hold the defendants responsible for the actions of the designated board members which enabled [defendants] to benefit enormously from the tender offer while leaving [GC] broke." (Id.)

The complaint alleges that defendants engaged in similar self-dealing transactions, such as negotiating with (a then-insolvent) GC an agreement whereby defendants could sell their restricted shares to the public. The CIBC and ULLICO defendants thereafter did just that, participating in a secondary offering of GC stock that took place in April 2000, and in which the insiders and GC each sold about half of the stock being tendered. Once again, plaintiff claims that had GC sold more stock in that offering, it could have raised more funds for its beleaguered corporate treasury. (Id. 8.) All in all, the complaint alleges that the CIBC defendants realized $2.4 billion on its stock sales during the relevant period, CCC realized over $1.7 billion, and the

ULLICO defendants realized over $200 million.

Defendants' GC board designees resigned at various times between September 1999 and March 2001, and in January 2002, GC (and various subsidiaries) filed for Chapter 11 bankruptcy relief.  (Id. 10.)

III.  The Claims

The legal theory of the complaint is threefold:  First, plaintiff claims that the stock acquired under the ASA and buyout agreements, the sales of GC stock from 1998-2000, and also certain financial services fees paid to the CIBC defendants, constituted fraudulent transfers under the federal Bankruptcy Code, 11 U.S.C. §§ 544 and 550, and the New York Debtor and Creditor Law ("DCL") §§ 270-81, in that the stock, "opportunities" to sell stock, and service fees were acquired in exchange for inadequate consideration, and at a time when GC was "insolvent or was left, as a result of the transfers, with unreasonably small capital."  (Count 1, Compl. ¶¶ 242-46.) The twenty or so transfers at issue are listed at paragraph 243 of the complaint.  Second, the complaint alleges that defendants, either directly or through the participation of their designees on GC's board, owed fiduciary duties to GC, and breached those duties by, inter alia, engaging in massive self-dealing (in the form of the transactions for which recovery is sought under Count 1), insider trading, and other misconduct.  (Counts 2-7, id. ¶¶ 247-84.)  The complaint seeks various forms of monetary and equitable relief on these claims (including disgorgement of defendants' profits).  Finally, the complaint asserts a statutory claim under N.Y. Bus. Corp. L. § 720(a) to hold defendants liable for alleged waste of corporate assets (again, the self-dealing transactions complained about in Count 1) committed by their designees while serving on GC's board.  (Count 4, id. ¶¶ 265-70.)

**DISCUSSION**

I.  Count I: Fraudulent Transfer Claims under 11 U.S.C. §§ 544 and 550

The Estate Representative, in Count 1, claims that the defendants received property from GC while the company was insolvent or undercapitalized, or which caused insolvency or undercapitalization, and that those transfers are voidable under federal bankruptcy and state debtor law.  As previously noted, paragraph 243 of the complaint contains a table of the voidable transfers, including:

> - transfer of GC stock then worth approximately $19.7 million to the CIBC defendants and ULLICO in connection with the buyout of the ASA agreements (Compl. ¶¶ 132-40);
>
> - transfer to the defendants of opportunities to sell stock, and to secure a larger corporate breakup fee, worth approximately $1 billion, in connection with the 1999 US West tender offer (id. ¶¶ 152-70);
>
> - transfer to the CIBC and ULLICO defendants of the right, worth over $300 million, to sell previously restricted GC stock by means of a secondary offering in 2000 (id. ¶¶ 143–46, 171–79); and
>
> - transfers to the CIBC defendants of approximately $58.7 million in fees for various transactions from 1998-2000 (id. ¶ 142) and to ULLICO's subsidiary MRCo. of $194,696 in advances in 1998 in connection with the termination of the ASAs (id. ¶ 130).

A.  Statutory Background

The Estate Representative seeks to void the listed transfers and recover their value under 11 U.S.C. §§ 550(a) and 544(b).  Section 550 provides that:

> (a) . . . [T]o the extent that a transfer is avoided under Section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made.

Section 544, in turn, states that:

> (b)(1) . . . [T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title.

The "applicable law" in this instance is the New York Debtor and Creditor Law, section 247 of which provides as follows:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Section 273 further provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

B.  Defendants' Arguments

Defendants make a number of procedural and substantive arguments in opposition to the Estate Representative's fraudulent transfer claim.

1.  Statute of Limitations

Section 546 of the Code, entitled "Limitations on avoiding powers," states as follows:

> (a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of
>
> > (1) the later of–
> >
> > > (A) 2 years after the entry of the order for relief; or
> > > (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or

9

> 1302 of this title if such appointment or such
> election occurs before the expiration of the period
> specified in subparagraph (A); or

> (2) the time the case is closed or dismissed.

The order for relief in GC's bankruptcy was entered on the date the bankruptcy commenced, January 28, 2002, and no trustee was ever appointed. Thus, under section 546(a), any avoidance claim asserted by the Estate Representative (all of which arise under section 544) after January 28, 2004, is untimely. In this case, all claims against CCC, and the claims against the ULLICO defendants relating to the US West merger and tender offer, and the April 2000 secondary offering, were first asserted in May and June of 2005, over a year late. (Pl. Mem. 50-51.) The Estate Representative makes two principal arguments as to why these claims are nevertheless timely. Neither has merit.

First, the Estate Representative argues that the limitations period in section 546 is "trumped" by the six-year limitations period for actions commenced directly under DCL §§ 273-74. See N.Y.C.P.L.R. § 213; Le Roux, 244 B.R. at 241 (holding six-year limitations period applies to state-law actions commenced under DCL sections 273-74). In support, it points to cases applying state statutes of limitations to section 544(b) claims. See In re Kelton Motors, Inc., 130 B.R. 170, 179-82 (Bankr. D. Vt. 1991) (concluding, without analysis, "that Section 544(b) is derived from former § 70e of the Bankruptcy Act and is geared to enable a trustee to resort to State law to recover property of the estate where the State law may have a more favorable statute of limitations"); In re Robbins, 91 B.R. 879, 883 (Bankr. W.D. Mo. 1988) (noting that despite two-year limitations period set out in section 546(a), section 544(b), by invoking state substantive law, also invokes that state's statute of limitations); In re Josefik, 72

B.R. 393, 397 n.4 (Bankr. N.D. Ill. 1987) (same); see also In re Gary S. Lowenstein, 312 B.R. 6, 16 (Bankr. D. Mass. 2004) (applying state statute of limitations under section 544(b) without discussing section 546(a)); In re Luis Elec. Contr. Corp., 149 B.R. 752, 757 (Bankr. E.D.N.Y. 1992) (same); In re O.P.M. Leasing Servs., Inc., 28 B.R. 740, 759 (Bankr. S.D.N.Y. 1983) (same).

Second, the Estate Representative points to cases holding that resort to a state statute of limitations for section 544(b) claims is expressly permitted by section 108(a), which provides:

> (a) If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the [bankruptcy] petition, the trustee may commence such action . . . before . . .
>
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case.

While the Estate Representative points to no case holding that under section 108(a), a *longer* state statute of limitations *extends* the period for filing under section 546(a),[5] cases have held that section 108(a) prevents a *shorter* state statute of limitations from *curtailing* the period under section 546(a), at least where the state statute of limitations has not expired by the time the bankruptcy case commenced. See Lippe v. Bairnco, 225 B.R. 846, 853 (S.D.N.Y. 1998); In re Borriello, 329 B.R. 367, 372 (Bankr. E.D.N.Y. 2005); In re Southern Health Care of Arkansas,

---

[5] A number of cases cited by the Estate Representative apparently for this proposition say no such thing. For instance, In re Harry Levin, Inc., 175 B.R. 560, 570 (Bankr. E.D. Pa. 1994), expressly reserved decision on this issue, see id. at 570 n.3, while other cases make no mention of section 544, and indeed indicate that the claims at issue in those cases were not avoidance claims under the Code, but rather wholly separate state law claims. See Schwartz v. Pierucci, 60 B.R. 397, 403 (E.D. Pa. 1986); Ambrose Branch Coal. Co., Inc. v. Tankersley, 106 B.R. 462, 464-65 (W.D. Va. 1989); In re Argo Comms. Corp., 134 B.R. 776, 787-89 (Bankr. S.D.N.Y. 1991).

<u>Inc.</u>, 299 B.R. 918, 922 (Bankr. E.D. Ark. 2003); <u>In re C.F. Foods, L.P.</u>, 280 B.R. 103, 112

(Bankr. E.D. Pa. 2002); <u>In re Carroll Indus., Inc.</u>, 153 B.R. 100, 102 (Bankr. D.N.H. 1993).

The Court is unpersuaded by these arguments. Section 546(a), by its very terms, applies

to any "action or proceeding under section 544" and it specifically states that any such action

"may not be commenced" after, at the very latest, two years after the entry of the order of relief.

There is no room in this language for the importation of state statutes of limitations, and no good

reason to do so is provided by the cases cited by the Estate Representative, which either apply

state statutes of limitations without mentioning section 546, or state that the importation of state

substantive law into section 544 implies the importation of state procedural law, without

seriously contending with the conflicting and categorical language of section 546. <u>See</u> <u>also</u> 4

Collier on Bankruptcy ¶ 544.03[2] at 544-21 to -22 (L. King 15th ed. 1989) (noting that "[o]nce

the case has commenced, section 546(a) . . . specifies the time within which the trustee must act

under section 544(b)").[6]

As for section 108(a), that section by its own terms is inapplicable to an action

commenced under section 544(b), because section 108(a) applies only where "applicable

nonbankruptcy law . . . fixes a period within which the debtor may commence an action." The

"action" here is a federal bankruptcy avoidance action under section 544(b), and state law fixes

no statute of limitations for it. This is true even though section 544(b) does nothing more than

authorize the trustee to recover property that could be recovered by a creditor under applicable

---

[6] On the other hand, a state statute of limitations may be relevant to a section 544(b) claim if it expires before the bankruptcy case commences; in such a situation, the trustee is deprived of standing to assert the claim. The reason is that when the bankruptcy began, and thus when the bankruptcy estate acquired the right to assert the claim, there is no claim to assert, because the claim is already untimely and precluded.

state law.  Cf. Collier on Bankruptcy, § 108.02, ¶ 108.02 (15th ed. 2005) (noting generally that

"section 108 clearly allows for the commencement or continuation of an action beyond two years

from the order of relief if applicable nonbankruptcy law fixes a time period which extends

beyond that two year limitation" but specifically stating that "[i]t is important to note . . . that

periods of limitation for causes of action arising under the Code are separately governed by

section[] 546(a)"); In re Mahoney, 111 B.R. 914, 917-18 (Bankr. S.D. Cal. 1990) ("These

avoiding powers, while utilizing state substantive law, are created by the Bankruptcy Code.").

There is another reason to reject the applicability of section 108(a).  In In re Everfresh

Beverages, Inc., 238 B.R. 558 (Bankr. S.D.N.Y. 1999), the court held that section 546 is "the

only applicable limitations period" for section 544 claims, including claims arising under section

544(b), and it specifically rejected the argument that section 108(a) permitted application of New

York's six-year statute of limitations period where the section 546 period had already run.  Id. at

571-72.  The court reasoned that under section 544(b), the trustee (or debtor-in-possession)

succeeds to a claim belonging to a *creditor*, not to the *debtor*.  See 11 U.S.C. § 544(b) ("[T]he

trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under

applicable law by a creditor . . . .").  But section 108(a), by its very terms, applies only where

"applicable nonbankruptcy law . . . fixes a period within which the *debtor* may commence an

action" (emphasis added).  "The statute is explicit in that it applies to save and preserve a statute

of limitations only where the cause of action sought to be asserted by the trustee is a claim that

the debtor could have brought," and thus, "§ 546 provides the relevant statute of limitations and

it is not extended by reference to § 108(a)."  In re Everfresh Beverages, Inc., 238 B.R. at 572-73;

accord In re Princeton-New York Investors, Inc., 219 B.R. 55, 58-59 (Bankr. D.N.J. 1998); Dry

13

Wall, 238 B.R. at 935 n.2; In re Topcor, 132 B.R. 119, 125-26 (Bankr. N.D. Tex. 1991); In re Hansen, 114 B.R. 927, 932 (Bankr. N.D. Ohio 1990).[7]

Finally, six-and-one-half lines in the Estate Representative's mammoth 55-page opposition memorandum are devoted to the additional argument that even if section 546(a) is applicable to this action, and section 108(a) is not, the statute of limitations should be equitably tolled. The entirety of the argument for why that doctrine should apply in this instance is that "the protections of statutes of limitations are not available to self-dealing fiduciaries." (Pl. Mem. 54 (quotation marks omitted)). While that may be true as a general matter, the Estate Representative makes no attempt to explain why it holds true here, where the relevant two-year limitations period began after GC's collapse and the commencement of the bankruptcy proceeding, when presumably all the alleged self-dealing fiduciaries had already left the scene, and where the Estate Representative did in fact timely file avoidance claims against certain defendants. There is thus no basis for equitably tolling the statute of limitations.

For these reasons, Count I is dismissed as to CCC, and as to the ULLICO defendants to the extent that it relates to the US West merger and tender offer or the April 2000 secondary offering.

2. CIBC's Statute of Limitations Argument

Although the fraudulent transfer claims against CIBC were unquestionably asserted within section 546(b)'s two-year window, the CIBC defendants argue that the claims are

---

[7] The Estate Representative relies on In re Dry Wall Supply, Inc., 111 B.R. 933, 936 (D. Colo. 1990) for the general principle that section 546 is not intended to limit, but rather only to supplement, state statutes of limitations. (Pl. Mem. 52-53.) However, the case expressly denies any such general principle, noting that once a bankruptcy commences, section 546(a) provides the sole limitations period for section 544(b) claims. Id. at 935-36.

untimely as to CIBC's subsidiaries, which were first named as defendants in the Consolidated Amended Complaint, filed more than two years later than the January 28, 2002, entry of GC's order of relief.

The Estate Representative responds principally that the claims against the CIBC subsidiaries relate back to the date of the original complaint, in which CIBC was named, under Fed. R. Civ. P. 15(c)(3). That rule provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted if [inter alia] the party to be brought in by amendment . . . knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." The Estate Representative claims that such is the case here, especially considering that in the original complaint, CIBC was expressly defined to include the subsidiaries which have now been named as defendants (Original Compl. ¶¶ 39, 354-55), and because:

> in this welter of related entities, at the time of the initial complaint plaintiff had difficulty in determining which among them could properly be charged with liability. . . . Given the close identity of interest between CIBC and its subsidiaries, the subsidiaries had every reason to know that, but for [the Estate Representative's] confusion or mistake concerning the identity of the proper parties, they would have been defendants from the beginning.

(Pl. Mem. 36.)

The Court agrees. See In re Integrated Res. Real Estate Ltd. P'ship Secs. Litig., 815 F. Supp. 620, 644 (S.D.N.Y. 1993) ("In view of the history of the application of Rule 15(c), the phrase 'a mistake concerning the identity of the proper party' should clearly not be read to limit its usefulness to cases of misnomer. . . . As long as the original complaint gives the defendant

adequate notice, an amendment relating back is proper even if it exposes defendants to greater damages."); In re Newcare Health Corp., 274 B.R. 307, 312-13 (Bankr. D. Mass. 2002) (noting that because the original and new defendants were "closely related in business or other activities . . . it is fair to presume the added parties learned of the institution of the action shortly after it commenced" (citation omitted)).

Here, the original complaint provided ample notice that the conduct of the named CIBC subsidiaries was in question, and the defendants clearly knew that they would be named as defendants as soon as the Estate Representative figured out who were the right CIBC entities to sue.[8]

### 3. Interest of the Debtor in Property

Section 544(b) permits a trustee to avoid certain prior transfers of an "interest of the debtor in property." Defendants argue that GC lacked any property interest in the stock (or opportunities to sell stock) that it allegedly transferred to defendants – such as the $20 million of stock sold to defendants in connection with the August 1998 buyout of the ASA agreements and the alleged transfer of the opportunity to sell stock in the course of the failed 1999 US West

---

[8] Relatedly, CIBC contends it cannot be held liable for transfers made to one or another of the remaining CIBC defendants. To the extent the Estate Representative seeks to hold CIBC liable for transfers made to the other CIBC defendants (a matter that is not entirely clear from the complaint), that raises factual issues that cannot be resolved at the pleadings stage: for instance, whether the CIBC defendants procured such property for the benefit of CIBC, or subsequently transferred such property to CIBC, see 11 U.S.C. § 550(a)(1); or whether recovery can nonetheless be sought from CIBC on an agency or alter-ego theory. But see United States v. Bestfoods, 524 U.S. 51, 61 (1998) (noting parent corporations not ordinarily liable for acts of subsidiaries).

merger – and thus that these transfers cannot be avoided.[9]

First, defendants argue that a corporation does not have a property interest in its unissued stock.  See In re Decker, 362 F.3d 593, 596 (9th Cir. 2004) (concluding that Trustee could not avoid sale of stock because "unissued stock is not an interest of the debtor corporation in property; it is merely equity in the corporation itself"); In re Curry and Sorensen, Inc., 57 B.R. 824, 829 (B.A.P. 9th Cir. 1986) (concluding that "[a] share of capital stock represents a unit of ownership interest and has no extrinsic value to the corporation itself" and thus "an action directed at recovery of corporate stock could only affect equitable ownership of the corporation and would not restore property to the estate or avoid an estate obligation").[10]  The Court disagrees.  Looking past the technicalities of corporate law discussed (opaquely) by the courts in Decker and Curry, at base an issuance of stock involves a corporation exchanging stock in itself for money or other valuable property.  Given a corporation's power to transfer stock to third parties in exchange for value, the argument that the corporation lacks an interest in the stock itself at the time of issuance blinks economic reality.  That is especially true given the scope of a debtor's property interests under the Code, which includes any legal or equitable interest of the debtor in property, and which is intended to be broadly construed.  United States v. Whiting

---

[9]  The Estate Representative does not seek recovery of the stock or sale opportunities *themselves*, which of course are now unrecoverable, but rather the value of that property at the time of transfer.  See, e.g., In re Colonial Realty Co., 226 B.R. 513, 525 (Bankr. D. Conn. 1998) (noting that purpose of statute is to restore the estate to financial condition if transfer had not occurred, and that where property is unrecoverable, value of property at time of transfer may be recovered).

[10]  A separate line of cases establishes that a corporation has no property interest in shares *held by its shareholders.*  See, e.g., In re Journal-News Corp, 193 F.2d 492 (2d Cir. 1951).  Because this case concerns stock *held by the corporation,* those cases have no bearing here.

17

Pools, Inc., 462 U.S. 198, 204-05 (1983); see also, e.g., In re Mid-Island Hosp., Inc., 276 F.3d

123, 128 (2d Cir. 2002) (covers contingent interests in property); In re Prudential Lines, Inc.,

928 F.2d 565, 571 (2d Cir. 1991) (includes interests in intangible property).[11]

Defendants next argue that even if, as a general matter, a corporation has a property

interest in unissued stock, if GC was insolvent when it sold this stock, as the complaint

repeatedly alleges (Compl. ¶ 6 ("While [GC's] financial statements were manipulated to appear

robust, in truth many of Global Crossing's operations were struggling and the Company was

insolvent at all relevant times."); see also id. ¶ 103 (stating that Global Crossing was

"perpetually insolvent"); id. ¶ 145 (noting that GC was insolvent even prior to its IPO)), that

stock could not have had any value to its creditors because it would by definition have been

worthless.  (CIBC Mem. 16.)  The argument is that when a corporation is insolvent, its liabilities

outstrip the value of its assets, see DCF § 271 (stating a person is "insolvent" when "the present

fair saleable value of his assets is less than the amount that will be required to pay his probable

liability on his existing debts as they become absolute and matured"), leaving no assets for

potential distribution to the shareholders once the company's creditors are paid off, and thus

rendering the corporation's stock valueless.  See, e.g., In re Roco Corp., 701 F.2d 978, 982 & n.7

(1st Cir. 1978) (concluding stock of insolvent corporation was "virtually worthless," and citing

cases "holding that shares of stock sold back to the corporation were valueless, largely due to the

insolvency of the corporation").  The Estate Representative does not address this argument, and

merely asserts that whatever the actual status of GC at the time these transfers were made, GC

---

[11]  Although these cases construe the scope of property of the estate under section 541(a),
and not property of the debtor under section 544(b), the Supreme Court has held that the same
interpretation should be applied to both.  See Begier v. IRS, 496 U.S. 53, 58-59 & n.3 (1990).

stock had *market* value until the date of its January 2002 bankruptcy filing.

While it is true that under certain circumstances the stock of an insolvent corporation may have value based on its estimated future profitability,[12] that is not the case where the fundamental premise of the complaint is that the corporation was doomed to fail. And that is indeed what the complaint here repeatedly and emphatically asserts.[13] Absent some explanation (and plaintiff provides none), the Estate Representative may not argue out of one side of its mouth that GC was in dire financial straits, completely insolvent, and destined for failure when this stock was transferred, and out of the other side argue that its stock had tremendous value that the creditors of GC should be permitted to now recover. For that reason, Count I must be dismissed to the extent that it attempts to avoid transfers of stock and opportunities to sell stock

---

[12] See In re Bridge Info. Sys., Inc., 311 B.R. 781, 791 (Bankr. E.D. Mo. 2004) (noting that while "[s]ome courts have held that the equity interest of an insolvent corporation is worthless as a matter of law . . . . [t]he better position . . . is that the equity interest of an insolvent corporation may have some value because the equity holders are entitled to share in the corporation's profits if it becomes profitable in the future")

[13] See, e.g., Compl. ¶ 6 ("[I]n truth many of Global Crossing's operations were struggling and the Company was insolvent at all relevant times. Buoyed by artificially strong credit ratings and inflated stock prices, and willingly assisted by others outside the Company, Global incurred billions of dollars of debt that its business operations would never be able to repay."); id. ¶ 54 (noting that GC raised "[u]pwards of $6.2 billion in debt, which the Company never had realistic prospects of being able to pay as it came due . . . ."); id. ¶ 65 (noting that assuming proper accounting, "Global Crossing's reported revenue for 1998 would have been $7.3 million, and for 1999 would have been $28.2 million – far less than the amounts actually reported. Never profitable, Global Crossing would have shown much larger losses than it did, and its financial statements would have been wholly insufficient to support the massive lending that actually occurred."); id. ¶ 91 (stating that GC's true economic state "was at all times a state of ever-growing operating losses and ever-deepening insolvency"); id. ¶ 140 (stating that nothing justified conclusion in middle of 1998 that "Global Crossing would have revenues over a 25-year period with a 1998 present value of approximately $6.75 billion," where complaint elsewhere alleges upwards of $6.2 billion in debt); id. ¶¶ 221-34 (reviewing "disastrous" acquisitions by GC during the relevant period).

to defendants.

4. Excessiveness of Fees

The CIBC defendants also contend that the Estate Representative cannot recover the $58.7 million in financial services fees paid to them during 1997 to 2000 because GC received "fair consideration" for those payments as a matter of law. (CIBC Mem. 18-19.) Clearly, the question whether "fair consideration" was received is a factual one, and thus even where on the surface it would appear that such is the case (for example, the CIBC defendants point out that during the period, GC managed to raise billions of dollars in capital, precisely what it had asked the CIBC defendants to accomplish, id. 18-19), it would be premature to dismiss these claims. See Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 106 (S.D.N.Y. 2004) ("It would . . . be premature to dismiss the § 548(a)(1)(B) claim on the ground that the value transferred . . . appears, in simple mathematical terms, to exceed that of the allegedly fraudulent transfers. The totality of the circumstances must be examined, and [plaintiff] has the right to offer evidence in an effort to show that, contrary to appearances, it did not receive "reasonably equivalent value in exchange for the transfer" (citations omitted)).

5. Identification of a Creditor

Section 544(b) "gives the trustee the power to avoid transfers or obligations of the debtor that are avoidable by an *actual, existing* unsecured creditor under nonbankruptcy law." 5 Collier on Bankruptcy ¶ 544.02 (Alan N. Resnick & Henry J. Sommer eds. 15th rev. ed. 2006). Thus, "[i]f there are no creditors against whom the transfer is voidable . . . the trustee is powerless to act" and "[t]he burden is on the trustee to demonstrate the existence of an actual creditor with a viable cause of action." Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman,

277 B.R. 20, 28 (S.D.N.Y. 2002) (quotation marks and citations omitted); see also In re 9281 Shore Road Owners Corp., 187 B.R. 837, 851-52 (E.D.N.Y. 1995) (noting that "the trustee must demonstrate that there existed an actual unsecured creditor at the time of the transfer . . . whose shoes the trustee may step into so as to avoid the transfer under applicable state law"). Defendants argue that the Estate Representative's claims are deficient because of the failure to explicitly identify a creditor on whose behalf the claims are advanced. Specifically, defendants observe that insofar as the Estate Representative's claims arise under DCL § 273, it must identify a creditor at the time each of the alleged transfers were made who remained a creditor at the time of GC's bankruptcy. (CIBC Mem. 22.)

Courts are divided on whether a complaint must specifically identify the creditor in whose shoes the trustee (or in this case, the Estate Representative) is bringing suit, or if that fact is simply a matter for trial. Compare In re Sverica Acquisition Corp., Inc., 179 B.R. 457, 465 (Bankr. E.D. Pa. 1995) (holding allegation merely that "an unsecured creditor of the Debtor existed" at time of transfer insufficient because "it fails to adequately place Defendants on notice of whose rights the Trustee is claiming under. Such notice is imperative here because the Trustee's rights under Code § 544(b) are derivative of whatever rights the alleged creditor had under state law. It is crucial therefore that Defendants have proper notice of the identity of the alleged creditor in order that they might confirm or deny the validity of that entity's claim.") and Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1148 (C.D. Cal. 2003) (requiring plaintiff "to allege specifically the identity of the unsecured creditor(s) whose rights he is asserting"), with Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 673-74 (D.R.I. 1998) ("The Complaint clearly satisfies the requirements of Rules 8 and 9(b). . . . Plaintiff's failure to name

an existing creditor is of no moment, for he is not required to prove his case at this point; his allegation that such a creditor exists suffices.") and In re Healthco Int'l, Inc., 195 B.R. 971, 980 (Bankr. D. Mass. 1996) ("[T]he Trustee alleges he represents 'at least one qualified, unsecured creditor holding an allowable unsecured claim which existed at the time of the LBO . . . .' Under the liberal rule of notice pleading, that allegation is enough.").

Whichever side has the better of the argument, the complaint does identify creditors in whose shoes the plaintiff may potentially bring these claims. As defendants concede, the complaint notes that in May 1998, GC made a offering of promissory notes ("9 5/8% Global Crossing Holdings Ltd. notes in $1000 multiples" or "the Restricted Notes") which it exchanged for new notes ("the Exchange Notes") in October 1998, and that "[u]pon information and belief, some of the purchasers of the Restricted Notes participated in the exchange offer, acquired the Exchange Notes, retained the Exchange Notes throughout the Relevant Period, filed proofs of claim in the pending bankruptcy proceeding, and are creditors in [GC's bankruptcy.]" (Compl. ¶¶ 94-96.) The CIBC defendants claim that that is not enough – that the Estate Representative must specifically identify "one such creditor" because "it has had access to the proofs of claim filed by all creditors." However, there is no authority for the proposition that the Estate Representative must be more specific than to identify the category of creditors with potentially viable claims. This is unquestionably enough to put defendants on notice of the creditors who supply the basis for the right to sue, and will permit them to answer, seek relevant discovery, and defend against these claims, a point illustrated by the fact that the ULLICO defendants have already raised a substantive defense against the ability of any creditor within the Restricted/Exchange Notes class to sue them (based on certain waiver provisions in the

agreements governing the Exchange Notes[14]).

Finally, in an argument made for the first time in its reply brief, the CIBC defendants contend that the complaint "makes clear" that many of the transactions that the Estate Representative seeks to avoid involve GC affiliates, rather than GC itself, and that "[p]laintiff has failed even to hypothesize the existence of a creditor of these entities who would have had standing to bring the claims it asserts." (CIBC Reply 32.) As an initial matter, this argument was not timely raised. See, e.g., Cioffi v. Averill Park Central Sch. Dist. Bd. of Ed., 444 F.3d 158, 169 (2d Cir. 2006) (deeming waived argument made for first time in reply brief). In any event, it is not at all "clear" that any of the alleged transfers were from entities other than GC itself; and it is further unclear whether, even if one or more of them are, the creditors of GC discussed above would not have standing to challenge them anyway, based on, inter alia, a corporate-veil piercing/alter-ego analysis, or because GC itself suffered based on the affiliate's diminution in value due to the transfer at issue. These questions are properly deferred until after discovery.[15] _____

_____

[14] As there is a dispute between the ULLICO defendants and the Estate Representative as to the interpretation and scope of those waiver provisions (compare ULLICO Mem. 12-14 with Pl. Mem. 41 n.37), the Court will reserve decision on the substantive argument until after the parties have had a chance to develop a record on the issue.

[15] The CIBC defendants also argue, in passing, that the complaint insufficiently alleges which GC entity was the transferor for each alleged avoidable transfer listed in paragraph 243. (CIBC Mem. 20 n.7.) To the extent that the argument is that the Estate Representative lacks standing to avoid certain of these transfers because they were not made by GC or a related entity whose interests the Estate Representative represents, that argument can be considered at the summary judgment stage.

### 6. Insolvency

Finally, defendants argue that the Estate Representative's conclusory allegations of insolvency and/or undercapitalization at the time of the alleged transfers are insufficient. True, given the large influxes of capital during the period in question, skepticism of the claim that GC was in dire financial straits throughout its entire corporate existence is understandable. For instance, the CIBC defendants reject the notion that GC was insolvent at the same time it raised hundred of millions of dollars in capital in its August 1998 IPO. (CIBC Mem. 20.) However, the complaint also alleges that during the relevant period GC was ringing up a colossal amount of debt that it would never be able to repay. (Compl. ¶¶ 54, 65, 92-93.) In the end, while it may turn out that the Estate Representative will be unable to prove this element as to some or all of its claims, it has satisfied the minimal burden it faces at this early stage of the proceedings. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002) (noting that under Rule 8(a), complaint must "simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. . . . This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. . . . The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." (quotation marks and citations omitted)).

II.  Counts II-VII: Fiduciary Duty Claims

_____As previously noted, in Counts 2-7, the Estate Representative asserts that defendants,

with and through the individuals they designated to GC's board of directors, breached their

fiduciary duties to GC by, inter alia, engaging in massive self-dealing and insider trading.  The

Estate Representative seeks damages and equitable relief (including a disgorgement of all

defendants' profits during the period at issue).  Defendants raise a number of objections,

addressed below.

As an initial matter, the Court notes that because GC is a Bermuda corporation,

Bermuda law arguably governs any claims asserting a breach of fiduciary duty.  However, the

Estate Representative contends that New York law applies (Pl. Mem. 11-12 n.11; Orig. Compl.

¶ 223 ("This Adversary Proceeding . . . seeks relief under the Bankruptcy Code, the Common

Law of the State of New York and New York Business Corporation Law . . . .")), without

objection from defendants, and in fact with the express approval of the CIBC defendants, who

state that even if Bermuda law applies, "[b]ecause plaintiff has failed to state a claim under New

York law, the Court need not reach the question of whether or under what circumstances

Bermuda law imposes a fiduciary duty on a minority shareholder."  (CIBC Mem. 27-28 n.10.)

Accordingly, the Court will analyze the fiduciary duty claims under New York law.

_____A.  Standing

Defendants argue that the Estate Representative lacks standing to sue for relief on the

fiduciary duty claims.  They point out that like a bankruptcy trustee, the Estate Representative

"'has no standing generally to sue third parties on behalf of the estate's creditors, but may only

assert claims held by the bankrupt corporation itself.'"  In re Bennett Funding Group, Inc., 336

F.3d 94, 99-100 (2d Cir. 2003), quoting Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d

114, 118 (2d Cir.1991). Thus, if these claims at issue belong to GC's creditors, and not to GC

itself, they would have to be dismissed for lack of standing. (CIBC Mem. 35.)

Assuming that the CIBC defendants are correct that the Estate Representative, like a

traditional bankruptcy trustee, lacks standing to sue on behalf of GC's creditors, the next

question is whether the fiduciary duty claims asserted in the complaint properly belong to GC or

to its creditors. On this score, defendants argue that any damage caused by defendants' alleged

conduct was inflicted on GC's shareholders and creditors, not on the corporation itself. In the

alternative, defendants argue that to the extent that a basis for liability to the corporation exists,

relief is precluded by the Second Circuit's Wagoner decision, in which the court stated that "a

claim against a third party for defrauding a corporation with the cooperation of management

accrues to creditors, not to the guilty corporation," Wagoner, 944 F.2d at 120, and by Wagoner's

familiar common law analogue, the rule of "in pari delicto potior est conditio defedentis"

(roughly translated, "In the case of equal fault, the position of the defending party is stronger").[16]

---

[16] While some courts have equated the Wagoner and "in pari delicto" rules, see Breeden
v. Kirkpatrick & Lockhart, LLP, 268 B.R. 704, 709 (S.D.N.Y. 2001); Wechsler v. Squadron,
Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 44 (S.D.N.Y. 1997); In re Verestar, Inc., –
B.R. –, 2006 WL 1620193, at *24-*27 (Bankr. S.D.N.Y. June 9, 2006); In re Hampton Hotel
Investors, 289 B.R. 563, 574 n.18 (Bankr. S.D.N.Y. 2003); In re Granite Partners, L.P., 194 B.R.
318, 328-31 (Bankr. S.D.N.Y. 1996); cf. Official Committee of Unsecured Creditors of Color
Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 164 (2d Cir. 2003), others have
characterized them as distinct, see In re Parmalat Secs. Litig., 383 F. Supp. 2d 587, 595-96
(S.D.N.Y. 2005); In re Constr. Co. Inc., – B.R. –, 2006 WL 1793655, at *4 n.4 (Bankr. S.D.N.Y.
May 31, 2006); In re Grumman Olson Indus., Inc., 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y.
2005).
    Other than the fact that the Wagoner rule is characterized as a standing rule, whereas "in
pari delicto" is an equitable defense, no Second Circuit case suggests a distinction between the
two rules, and even the district and bankruptcy court cases that suggest that one exists do not, for
the most part, explain what it might be. In any event, in this Court's view, the Wagoner and "in

To this end, the defendants point to the complaint, which is rife with allegations that GC's management was deeply involved in the misconduct underlying the alleged breaches of fiduciary duty.

On the first point, whether the Estate Representative has standing to sue on behalf of GC's creditors, the Estate Representative claims that even if the claims it asserts accrue only to GC's creditors, unlike the usual bankruptcy trustee, the Estate Representative "was created and specifically authorized by the Bankruptcy Court precisely to pursue claims on behalf of the creditors and with their permission." (Pl. Mem. 16.) This argument is a non-starter. It may be that the Estate Representative was created for the benefit of creditors, but the relevant question here is not who will ultimately benefit if the Estate Representative prevails, but whose claims the Estate Representative is empowered to assert. See In re Mediators, Inc., 105 F.3d 822, 825-26 (2d Cir. 1997) (holding creditors' committee suing in debtor's shoes lacked standing to assert creditors' claims, even though committee brought suit on behalf of creditors). The answer to that question is, as it is for a trustee, only those claims held by the debtor (unless otherwise authorized by the Bankruptcy Code). See Bennett, 336 F.3d 94, 99-100 (holding trustee lacks standing to assert creditors' claims unless specifically authorized by Bankruptcy Code). The Global Crossing Joint Plan of Reorganization, which created the Estate Representative, makes

pari delicto" rules are effectively identical. Wagoner's statement that the conduct of a corporation's management can be attributed to a corporation was merely a restatement of traditional agency doctrine, cf. Wight v. BankAmerica Corp., 219 F.3d 79, 86-87 (2d. Cir. 2000) (noting Wagoner rule reflects "fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation"), which even before Wagoner was potentially applicable to the "in pari delicto" rule. Wagoner's subsequent holding that the corporation, and thus the trustee, in that case could not assert a claim where it was involved in the defendant's alleged misdeeds, was essentially an application of the "in pari delicto" rule.

clear that the Estate Representative is empowered only to bring claims that GC as a corporation could have asserted. For instance, the Plan makes clear that while the Estate Representative "shall act as fiduciaries for and in the best interest of [certain classes of GC creditors]," Plan § 5.8(j)(3), the only claims that the Estate Representative is empowered to pursue are, in relevant part, "any and all rights, claims, credits, allowances, rebates, causes of action, known or unknown, pending or threatened . . . or rights of set-off . . . *of the Company [GC] and the Subsidiaries*." Id. § 1.45; Annexed Purchase Agreement, § 8.1(a)(v) (emphasis added); see also Plan § 5.8(h) (noting "the Estate Representative shall . . . have the power and authority to prosecute and resolve, in the names of *the Debtors* and/or the name of the Estate Representative, the Estate Representative Claims" (emphasis added)). The complaint itself confirms this point, noting that the claims that the Estate Representative is empowered to pursue are those "causes of action . . . transferred *by the Debtors*" (Compl. ¶ 13-15 (emphasis added)), which obviously excludes claims held previously not by GC but by third-party creditors.

On the second point, however, whether GC itself suffered any damage on account of the alleged breaches of fiduciary duty, while it is true that GC's shareholders and creditors would undoubtedly have been directly damaged by self-dealing and other prohibited conduct alleged in the complaint, the corporation itself may also have been damaged, for instance, because its assets were depleted by self-dealing transfers of corporate assets[17] or because the distortion of GC's financial picture caused it to take on more and more debt, plunging it further and further into insolvency, and ultimately frustrating future business prospects. In the end, the question of

---

[17] Of course, as discussed above, GC cannot claim that it was damaged by selling stock on the cheap, or by having missed opportunities to sell stock, during a period in which it asserts GC was insolvent and doomed to fail. See supra Part I.B.3.

damages is a factual question that cannot be resolved on the basis of the pleadings.

In any event, the Estate Representative points to the New York Court of Appeals' decision in Diamond v. Oreamuno, in which the court held that a showing of damage to a corporation is unnecessary to assert a fiduciary duty claim, and that in lieu of damages, the defendants' profits arising from the breach can be disgorged to the corporation. 301 N.Y.S.2d 78 (1969) (permitting, where there was no showing of damages to corporation, profits from corporate officer's insider trading to be disgorged). The court reasoned that:

> the function of [a fiduciary duty action] . . . is not merely to compensate the plaintiff for wrongs committed by the defendant but . . . to *prevent* them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.

Id. at 81. In addition, the Court emphasized that the principal issue is not whether the corporation was injured or not, but rather who, "as between the corporation and the defendants . . . has a higher claim to the proceeds derived from the exploitation of the [insider] information." Id.

Diamond would seem to foreclose any argument that the Estate Representative must plead and prove damages arising from the alleged breaches of fiduciary duty in order to state a claim for relief. However, the CIBC defendants, in their reply brief, respond that Diamond was decided at a time when there was no effective federal remedy for the type of insider trading at issue in that case, and that this was a primary factor motivating the Diamond court to rule as it did. (CIBC Reply 14-17.) See Diamond, 301 N.Y.S.2d at 85 ("In view of the practical difficulties inherent in an action under the Federal law, the desirability of creating an effective common-law remedy is manifest."). Defendants further assert that federal law now does provide

an effective remedy (a damages class action under Section 10(b)), and thus it is unlikely that the New York Court of Appeals would rule the same way, at least as to claims based on insider trading, if given the opportunity.  See In re Symbol Techs. Secs. Litig., 762 F. Supp. 510, 518 (E.D.N.Y. 1991) ("Today, twenty-two years after the decision in Diamond, it is the Court's view that the Rule 10b-5 class action has become the type of effective remedy for insider trading which the New York Court of Appeals had earlier envisaged").  This might be so, but this Court may not disregard the law as currently interpreted by the New York Court of Appeals. Defendants' suggestion that the court would likely overturn Diamond if given the opportunity is only of academic interest; this Court remains bound by that decision unless and until the Court of Appeals does so.

The CIBC defendants, in passing, also suggest that subsequent developments in federal law may have not only upended Diamond's rationale, but may have preempted it altogether. Defendants suggest that this is the case because federal law requires insider traders' profits to be paid over to contemporaneous purchasers, while Diamond permits those same profits to be disgorged to the corporation.  See Int'l Paper Co. v. Ouellete, 479 U.S. 481, 494 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal.").  This Court is reluctant to rule on a claim of federal preemption, apparently a matter of first impression, where the claim is made in only a few lines in a party's reply submission.  For that reason, the Court will defer ruling on the argument until the summary judgment stage, when the Estate Representative will have had the opportunity to respond to it. For the time being however, the Court notes that the Symbol Technologies court addressed an argument closely related to defendants' preemption argument – that Diamond should not be

followed because it may permit double recovery under certain circumstances – and determined

that such double-recovery could be avoided:

> If damages are awarded in this derivative action, to the extent that actual injury to the corporation is not proved, the profits defendants will be forced to disgorge if liability is established will be held in trust pending the resolution of related proceedings. The Second Circuit has upheld such an arrangement in the context of a suit brought by the Securities and Exchange Commission (in anticipation of future private actions). <u>See</u> <u>Securities and Exchange Commission v. Texas Gulf Sulphur Co.</u>, 446 F.2d 1301, 1307-1308 (2d Cir.), <u>cert. denied</u>, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971). The Court could, at the appropriate time, fashion the particular requirements of such a Trust, including the duration and the manner in which application could be made for its disposition. At the end of the specified period any money remaining undisposed of would become the property of Symbol Technologies.

762 F. Supp. at 518.[18]

That leads to the third point, whether the <u>Wagoner</u> and "in pari delicto" rules

nevertheless preclude relief on any fiduciary duty claim asserted by GC.[19]  At first glance, it

would appear that these rules do apply to the Estate Representative's claims; as defendants point

out, the complaint itself implicates most of GC's management in the alleged misconduct.

(Compl. ¶¶ 2, 189-220, 249.)  (CIBC Mem. 37.)  However, this is not the case.  Courts have held

that the <u>Wagoner</u> and "in pari delicto" rules do not apply to claims against corporate insiders for

---

[18]  However, the court also noted that "in many cases, since the claims of the injured investors may completely deplete the fund, the corporation might ultimately end up poorer for having brought the suit due to the cost of the litigation."  <u>Id</u>. at n.4.

[19]  While the <u>Wagoner</u> rule is characterized as a rule of standing, whether an equitable defense precludes relief on a claim that a corporation would otherwise have would seem to be a merits issue.  In any event, as the Second Circuit has characterized this issue in standing terms, <u>see</u> <u>Wagoner</u>, 944 F.2d at 120, this Court will as well.

breach of their fiduciary duties.  For instance, in <u>In re The Mediators, Inc.</u>, the Second Circuit

stated:

> The caselaw relied upon by [plaintiffs] all involved actions in the
> name of the corporation against a fiduciary of the corporation, not
> against third parties.  We agree that a bankruptcy trustee, suing on
> behalf of the debtor under New York law, may pursue an action for
> breach of fiduciary duty against the debtor's fiduciaries.

105 F.3d 822, 826-27 (2d Cir. 1997), <u>citing</u> <u>In re Keene Corp</u>, 164 B.R. 844, 853 (Bankr.

S.D.N.Y. 1994), <u>citing</u> N.Y. Bus. Corp. L. § 720 (additional citations omitted).[20]  Thus, to the

---

[20]  <u>See</u> <u>Wagoner</u>, 944 F.2d at 120 ("A claim *against a third party* for defrauding a
corporation with the cooperation of management accrues to creditors, not to the guilty
corporation." (emphasis added)); <u>In re Verestar, Inc.</u>, 343 B.R. 444, 479 (Bankr. S.D.N.Y. 2006)
(relying on <u>Wagoner</u> for the proposition that "a plaintiff acting on behalf of a debtor cannot sue
an *outside professional or other third party* for damages for which the corporation itself can be
held responsible" (emphasis added)); <u>In re IDI Constr. Co.</u>, -- B.R. --, No. 04-17881 (PCB), 2006
WL 1793655, at *5 (Bankr. S.D.N.Y. May 31, 2006) (holding that a debtor could sue its
principals "to recover the unpaid loans or to recover damages under any other theory," and
noting that "[t]he <u>Wagoner</u> Rule does not bar claims by a corporation against its own
fiduciaries"); <u>In re Monahan Ford Corp. of Flushing</u>, 340 B.R. 1, 23 (Bankr. E.D.N.Y. 2006)
("Here, the trustee has standing to bring this action on behalf of the debtor.  The present
allegations set forth a situation that is different than the fact pattern in which <u>Wagoner</u> is
generally invoked, where an outsider, such as an accounting or law firm, is alleged to have
assisted management in defrauding the corporation."); <u>In re Grumman Olson Indus., Inc.</u>, 329
B.R. 411, 425 (Bankr. S.D.N.Y. 2005) (acknowledging that <u>Wagoner</u> "does not bar claims
against corporate fiduciaries"); <u>In re Hampton Hotel Investors, L.P.</u>, 289 B.R. 563, 577 n.23
(Bankr. S.D.N.Y. 2003) ("The <u>Wagoner</u> Rule only deals with claims against third parties.  It
does not proscribe actions against insiders for breach of fiduciary duty, which are properly
claims of the trustee."); <u>see also</u> <u>In re Walnut Leasing Co.</u>, No. 99-526, 1999 WL 729267, at *5
& n.12 (E.D. Pa. 1999) (noting that "*in pari delicto* will not preclude the claims against
corporate insiders," that "[v]is-a-vis their corporations, insiders cannot avoid the consequences
of their own handiwork" and that "[n]o reported authority suggests that an officer or director can
assert the defense of *in pari delicto* as defenses to the claim brought here on behalf of the debtor
corporations"); <u>In re KDI Holdings, Inc.</u>, 277 B.R. 493, 518 (Bankr. S.D.N.Y. 1999) (holding
defense inapplicable to claims against alleged dominating and controlling outside entities); <u>id.</u>
("[T]he *in pari delicto* doctrine is inapplicable where a cause of action is brought against an
insider."); <u>In re Granite Partners, L.P.</u>, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996) ("*In pari
delicto* bars claims against third parties, but does not apply to corporate insiders or partners.
Otherwise, a trustee could never sue the debtor's insiders on account of their own

extent plaintiff can establish that defendants' alleged control and domination of GC rendered them corporate insiders and fiduciaries, <u>Wagoner</u> and the "in pari delicto" rules will not bar plaintiff's fiduciary duty claims. (<u>See</u> Pl. Mem. 17 (arguing that <u>Wagoner</u> is inapplicable because defendants are "self-dealing controlling shareholders" and "insiders who together 'dominated and controlled Global Crossing's board,'" quoting Compl. ¶ 259)); <u>see</u> <u>also</u> <u>infra</u> Part II.D.

Moreover, to the extent defendants are *not* corporate fiduciaries and insiders, they may be liable for *aiding and abetting* a breach of fiduciary duty. While the <u>Wagoner</u> and "in pari delicto" rules could bar plaintiff's claims under such circumstances, the applicability of these rules may hinge on certain fact-based considerations that cannot be addressed at the pleadings stage, for instance, the relative culpability of defendants and GC's management, <u>see</u> <u>Ross v. Bolton</u>, 904 F.2d 819, 824 (2d Cir. 1990) ("Where both parties are in delicto, but not in pari delicto, a trial court should make findings regarding the respective amount of blame assigned to each, granting relief to the one whose wrong is less."), and whether all relevant decisionmakers were involved in the alleged misconduct, such that the misconduct can be imputed to GC (and the Estate Representative), or rather whether there exists an "innocent member" of management who could have prevented the wrongs if he knew about them, <u>see</u> <u>Hampton</u>, 289 B.R. at 576 n.22; (Compl. ¶ 2 (alleging not all relevant decisionmakers were complicit in defendants' scheme)); <u>see</u> <u>also</u> <u>In re Neri Bros. Constr. Corp.</u>, 323 B.R. 540, 543 (Bankr. D. Conn. 2005) (noting that the Second Circuit has applied <u>Wagoner</u> and its progeny only where "the debtor

_____

wrongdoing."); <u>cf</u>. <u>Kalb, Voorhis & Co. v. Am. Fin. Corp.</u>, 8 F.3d 130, 133 (2d Cir. 1993) (holding "*in pari delicto*" defense inapplicable to claim against corporation's controlling shareholder under Texas law).

corporation involved was *wholly owned* and controlled by the principal wrongdoers"). But see American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp., 233 F.R.D. 327, 330-31 (S.D.N.Y. 2005) (disagreeing, as part of an alternative holding, with the "innocent insider" exception to the Wagoner rule).

For these reasons, defendants' standing objection fails, at least at this juncture.[21]

B. The ASA Transactions

The CIBC and ULLICO defendants contend that the Estate Representative may not assert any claim arising from the signing of the ASA agreements, because those agreements were struck between defendants and GT Parent – GC's predecessor – and GC did not succeed to the fiduciary duties owed to GT Parent, nor was GT Parent a debtor in the GC bankruptcy. See Schumacher v. Richards Shear Co., Inc., 59 N.Y.2d 239, 245 (1983) ("It is the general rule that a corporation which acquires the assets of another is not liable for the torts of its predecessor."); In

---

[21]  The Estate Representative suggests that the Wagoner and "in pari delicto" rules should not be applied against it for a different reason, citing Judge Posner's opinion in Scholes v. Lehmann, 56 F.3d 750, 754-55 (7th Cir. 1995), which held that where a corporation was taken over by a receiver, the "in pari delicto" defense was inapplicable because "the person who is in pari delicto is eliminated" and "the corporation[] [is] controlled by a receiver whose only object is to maximize the value of the corporation[] for the benefit of [its] investors and creditors." Other circuits, including the Second Circuit, have not adopted the Scholes view in the bankruptcy context. See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093-94 (2d Cir.1995) (applying Wagoner against bankruptcy trustee); see also Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, (3d Cir. 2001) (rejecting Scholes approach, and noting similar holdings of Sixth Circuit); In re Hedged-Invs. Assocs., Inc., 84 F.3d 1281, 1284-86 (10th Cir. 1996) (rejecting applicability of Scholes to bankruptcy trustee, noting that by statute trustee does not (save for a few exceptions) enjoy greater rights than the debtor). The Court agrees with those courts holding the Wagoner and "in pari delicto" rules applicable; whatever appeal Scholes may have in the receivership context, the Estate Representative, like a normal bankruptcy trustee, succeeded to GC's rights, and unless specifically authorized by the Bankruptcy Code, does not enjoy greater rights than GC simply due to the happenstance of bankruptcy. Therefore, if GC would have been subject to these rules, the Estate Representative is as well.

re Bennett Funding Group, Inc., 336 F.3d 94, 99-100 (noting that a trustee "may only assert claims held by the bankrupt corporation itself").

While the Estate Representative concedes the general applicability of this rule, it responds that in August 1998, GT Parent's shareholders, with the exception of CIBC, exchanged all of their GT Parent shares for GC shares[22]; GT Parent's directors all became directors of GC; and GC took over all of GT Parent's operations. (Compl. ¶¶ 104, 148.) While GT Parent continued to exist, it had no function other than to serve as a holding company for CIBC's GC shares. The Estate Representative argues that under the circumstances, GC was a "mere continuation" of GT Parent, and thus under New York law succeeded to its fiduciary rights. See Schumacher, 59 N.Y.2d at 245 ("A corporation may be held liable for the torts of its predecessor if [inter alia] there was a consolidation or merger of seller and purchaser [or] the purchasing corporation was a mere continuation of the selling corporation . . . .").

This argument is without merit. In Schumacher, the New York Court of Appeals rejected a similar argument, holding that the "mere continuation" doctrine was inapplicable even where the predecessor corporation had sold its assets, including exclusive rights over its product line and intellectual property, to the successor business, and thereafter discontinued its business and had no liability insurance, employees, or business volume, and few assets. Id. at 244-46. The court held that the "mere continuation" doctrine applies only "where . . . one corporation survives the transaction" and the "predecessor corporation [is] extinguished," and it noted that since the predecessor in that case survived the transaction "as a distinct, albeit meager, entity,"

---

[22] As previously noted, CIBC kept its GT Parent shares, but only so that it could use GT Parent as a holding company for its GC shares; after this time, GT Parent had no other function.

the doctrine was inapplicable.  Id.; see also Marenyi v. Packard Press Corp., No. 90 Civ. 4439,

1994 WL 533275, at *1-*3 (S.D.N.Y. Sept. 30, 1994) (holding that formal dissolution of the

predecessor entity, in addition to cessation of ordinary business, necessary for application of

mere continuation doctrine).  The Estate Representative does not address Schumacher, but

simply references a decision of the Western District of New York which failed to mention

Schumacher and which held (citing in turn to a lone District of New Hampshire decision) that

the "mere existence of a remaining paper corporation" did not defeat application of the "de facto

merger doctrine," a separate exception to the general rule against successor liability to which the

Estate Representative does not claim entitlement in its papers.  See New York v. Westwood-

Squibb Pharm. Co., Inc., 981 F. Supp. 768, 792-93 (W.D.N.Y. 1997), citing Kleen Laundry &

Dry Cleaning Servs., Inc. v. Total Waste Mgmt. Corp., 817 F. Supp. 225, 231 (D.N.H. 1993).

   The Estate Representative also relies on the general sentiment that "[i]t would be a

complete perversion of justice if this sort of transparent corporate switcheroo could succeed in

defeating core principles of equity and wiping out fiduciary obligations when the successor

entity was the vehicle for wrongdoing authorized by the directors."  (Pl. Mem. 31-32.)  Whether

or not the Court sympathizes, the Court of Appeals's decision in Schumacher binds this Court,

and the Estate Representative fails to explain why that decision is inapplicable to this case.  As

the ULLICO defendants observe, "[h]ere the Consolidated Amended Complaint acknowledges

GT Parent was not extinguished, but continued to exist as a wholly-owned subsidiary of CIBC.

(Compl. ¶¶ 104, 148.)  Thus, since GT Parent continued to exist, the mere continuation doctrine

does not apply, the Estate Representative does not have standing to assert breach of fiduciary

duty claims on GT Parent's behalf, and Counts 2-7 must be dismissed . . . to the extent they seek

to assert claims based on duties owed to GT Parent." (ULLICO Mem. 17-18.)

The CIBC defendants argue that in addition to claims arising from the execution of the ASA agreements with GT Parent (barred by <u>Schumacher</u>), claims arising from the buyout of those agreements (which GC itself did approve, Compl. ¶¶ 137-38) by GC shortly before the company's IPO, are also barred. They point to the Supreme Court's decision in <u>Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.</u>, 417 U.S. 703 (1994), which in essence held that a subsequent owner of a corporation, through his company, cannot sue the prior owner for mismanagement when it is not claimed that the subsequent owner was defrauded, the theory being that the subsequent owner got exactly what he bargained for when he purchased the company, and that in equity he should not be permitted to seek additional relief that would provide him with a windfall. <u>Id</u>. at 710-13.

The CIBC defendants analogize <u>Bangor</u> to this case, pointing out that at the time of the GC IPO, the ASAs and buyout agreements were a matter of public record, and so no IPO or post-IPO stock purchaser, and thus not GC itself on behalf of its shareholders, could have sued based on this transaction. Since the Estate Representative has standing only to pursue claims that GC had when it commenced its bankruptcy (unless otherwise authorized by the Bankruptcy Code), the Estate Representative cannot sue either.

The Estate Representative's sole argument is, once again, that the Estate Representative's function is to pursue claims for relief for the benefit of GC's *creditors*, not its shareholders. This argument, however, misses the mark. As previously noted, even though the Estate Representative exists for the benefit of GC's creditors, it sues in the shoes of GC, and thus is powerless to pursue relief that GC would have been unable to pursue itself prior to bankruptcy.

The Estate Representative does not dispute that GC, as a matter of equity, would not have been able to sue as to the buyout of the ASA agreements, and thus the Estate Representative may not either.

For these reasons, the fiduciary claims relating to the execution and termination of the ASA agreements will be dismissed.

C. <u>Statute of Limitations</u>

The CCC defendants, at the conclusion of their opening brief, assert that the statute of limitations for any breach of fiduciary duty where money damages, as opposed to equitable relief, is sought, is three years, and thus, because CCC was first sued on May 19, 2005, CG is barred from pursuing compensatory damages from CCC on any of its fiduciary duty claims (CCC Mem. 16.)[23] <u>See</u> <u>Cooper v. Parsky</u>, 140 F.3d 433, 440-41 (2d Cir. 1998) ("Ordinarily, under New York law, a claim for breach of fiduciary duty would be governed by a three-year limitations period if the action sought monetary relief but by a six-year period if the action sought equitable relief.").

While the Estate Representative vehemently disputes the applicability of the three-year statute of limitations, it cites to no case holding that the longer six-year limitations period applies to a breach of fiduciary duty claim seeking monetary damages. (Pl. Mem. 32-34.) It does attempt to distinguish <u>Cooper</u>, but that case specifically noted the application of the three-year limitations period to "ordinary" fiduciary duty claims seeking monetary damages, and only applied the six-year limitations period because it construed the claim in that case to be more akin

---

[23] CIBC makes the same argument, arguing that the complaint was untimely as to the other CIBC defendants, but because the relation-back doctrine applies as to the other CIBC defendants, <u>see</u> <u>supra</u> Part I.B.2, that argument is without merit.

to a claim for breach of contract.  Thus, the three-year limitations period is indeed applicable to any fiduciary duty claim seeking monetary damages.

In addition, the Estate Representative contends that the limitations period should be equitably tolled, arguing, as it did with respect to the limitations period applicable to its avoidance claims, that the protections of statutes of limitation are unavailable to self-dealing fiduciaries (as defendants are alleged to be).  CCC responds that equitable tolling is inappropriate here because the facts underlying the Estate Representative's claims should have been apparent to any shareholder at the time the challenged transactions were made.  (CCC Reply 9-11.)  The equitable tolling argument has more resonance here than in the context of the avoidance claims, where the limitations period began only when GC's bankruptcy began and the self-dealing fiduciaries were already out of the picture.  Especially considering that (at least some[24] of) the fiduciary duty claims seeking equitable relief are unquestionably timely, the Court deems it prudent to defer the question whether the facts and circumstances underlying the fiduciary duty claims warrant tolling to the summary judgment stage.

---

[24]  In its reply brief, CCC for the first time asserts that certain of the alleged breaches of fiduciary duty occurred outside even the six-year limitations window, thus precluding any claim for relief on those grounds.  (CCC Reply 9-11.)  The Estate Representative affirmatively states in its opposition memorandum that all the alleged breaches are timely under the six-year period. Because CCC's position shifted between its opening and reply submissions, the Court will defer ruling on this argument until the summary judgment stage, so that the Estate Representative has an opportunity to address it.  In any event, whether any of these claims are untimely will ultimately depend on whether the statute of limitations should be tolled, an issue also best addressed on a fuller factual record.

D. Fiduciary Status and Aiding & Abetting Liability

Defendants next argue that they did not owe any fiduciary duty to GC, either directly or through the involvement of their board designees on the GC board of directors.[25] First, defendants point out that under New York law, "'no trust relation ordinarily exists between the stockholders themselves or between the stockholders and the corporation, because the stockholders ordinarily are strangers to the management and control of the corporation business and affairs.'" Sager Spuck Statewide Supply Co. Inc. v. Meyer, 710 N.Y.S.2d 429, 432-33 (3d Dep't 2000), quoting Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 194 (1919); see also 12B William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5811 (2005) ("A shareholder, even a majority shareholder, ordinarily does not occupy a trust relation towards the other shareholders merely by virtue of owning stock"). Rather, a fiduciary duty exists only in those rare cases where a shareholder "dominate[s] and control[s] a corporation," and thus may be held liable "for detriment to the corporation caused by their breach of the fiduciary obligation arising from that relationship." Equity Corp. v. Groves, 294 N.Y. 8, 12 (1945) (citation omitted).

Where a shareholder only holds a minority stake in a corporation, the plaintiff faces a heavy burden in proving the existence of a fiduciary duty:

---

[25] CCC complains that the complaint fails to plead that defendants directly owed GC a fiduciary duty, separate from that owed by its board designees. (CCC Reply 7.) However, the complaint expressly states that "[d]irectly *and* through their designated members of the Company's board of directors, the defendants owed fiduciary duties of care and loyalty to the Company and its creditors." (Compl. ¶ 5.) Moreover, a direct control claim is fairly implied by the complaint's allegations that defendants controlled the board designees, who in turn controlled GC. (Id. ¶ 247-249.)

> Generally, a shareholder who owns less than fifty percent of a
> corporation's outstanding stock does not, without more, become a
> controlling shareholder of that corporation with a fiduciary status,
> although it is possible for a shareholder to be subject to a fiduciary
> duty even though not a majority shareholder, provided he or she is
> the "controlling" shareholder.  There must be some evidence
> demonstrating control, however, since the presumption is against
> it.

12B Fletcher, supra, § 5811.  Each of the defendants argue that their minority (though

substantial) GC stockholdings, and ability to appoint a minority of GC's board, are insufficient

to give rise to a fiduciary duty.  See, e.g., Medical Self Care, Inc. v. NBC, Inc., No. 01 Civ.

4191, 2003 U.S. Dist. LEXIS 4666, at *21 (S.D.N.Y. Mar. 28, 2003) (holding, on motion for

summary judgment, that minority shareholder who designated one member of company's board

owed no fiduciary duty); In re Healthco Int'l, Inc., 203 B.R. 515, 518 (Bankr. D. Mass. 1996)

(holding, on motion for summary judgment, that 9.96% stock ownership and ability to appoint

three of seven members of company's board did not establish "control" giving rise to fiduciary

relationship).  But see In re Tri-Star Pictures, Inc. Litig., 634 A.2d 319, 328-29 (Del. 1993)

(holding, on motion to dismiss, that minority shareholder's 36.8% stock ownership, coupled with

(1) voting agreements with other minority shareholders holding 19.8% of stock, (2) agreements

that minority shareholders would collectively designate eight members of company's board, and

(3) evidence of company's influence over most board members, was sufficient to establish

fiduciary relationship).

It may be true that the bare facts that defendants were minority stockholders in GC who

designated members of the GC board are by themselves insufficient to establish "control" over

GC, and thus a fiduciary relationship.  However, at the pleadings stage, the Court's function is

not to evaluate the specific facts alleged to determine whether they are alone sufficient to support

judgment for the plaintiff; it is only to determine whether the complaint provides the defendant with fair notice of what the plaintiff's claims are, the grounds upon which they rely, and makes it plausible that the plaintiff will develop, through discovery, a factual record that could support relief. The Supreme Court in <u>Conley v. Gibson</u> articulated the standard in this way:

> [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. . . . Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. . . . The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

355 U.S. 41, 47-48 (1957) (footnotes omitted); <u>see</u> <u>also</u> <u>Swierkewicz v. Sorema N.A.</u>, 534 U.S. 506, 512-14 (2002) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (quotation omitted)); <u>In re Global Crossing Secs. Litig.</u>, No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) (question is whether it is "plausible that plaintiff[s] could *develop* some set of facts that would pass muster").

Applied to this case, even if the Estate Representative has not pleaded specific facts sufficient to establish the "control" necessary for a minority shareholder to be charged with fiduciary obligations, it is enough that the complaint alleges that such control existed. (<u>E.g.</u>, Compl. ¶¶ 2, 249.) The Federal Rules afford the Estate Representative the opportunity, in discovery, to develop a factual record demonstrating that control by producing evidence of, inter

alia, defendants' oversight and influence over the GC board and corporate activities, direct involvement in corporate transactions, or pooling of voting power and/or joint action with other minority shareholders. After discovery is complete, defendants can then test the Estate Representative's evidence through a motion for summary judgment under Fed. R. Civ. P. 56.

The same does not apply, however, to the Estate Representative's claim that defendants owed a fiduciary duty to GC due to the participation of their designees on GC's board, on the theory that the designees were acting as their agents. The complaint alleges that defendants can be held responsible for their designees' breaches of fiduciary duty because defendants "controlled" (id. ¶ 248) their designees because the designees' violation of their fiduciary duties was done at defendants' "direction and for their benefit" (id. ¶ 254). Based on these allegations, the complaint charges that defendants, under the traditional agency principle of respondeat superior,[26] are liable for the acts of the board designees, because when the actions were taken, the designees were acting within the scope of their employment or were otherwise subject to defendants' direction and control. See In re Global Crossing Secs. Litig., No. 02 Civ. 910, 2005 WL 2990646, at *5 (S.D.N.Y. Nov. 7, 2005) (respondeat superior liability requires that primarily liable employee was acting within scope of employment); In re Global Crossing Secs. Litig., No. 02 Civ. 910, 2005 WL 1907005, at *9 (S.D.N.Y. Aug. 8, 2005) (when determining agency, control is the determinative issue).

---

[26] Although the complaint does not specifically invoke the law of agency or respondeat superior, that is implied by the complaint. To the extent that these allegations can be viewed as charging defendants with aiding and abetting their designees in the designees' breaches of fiduciary duty, the Court addresses such claims infra.

43

The courts that have addressed the application of respondeat superior liability in this context, save for one, have rejected it. See Medical Self Care, Inc. v. NBC, Inc., No. 01 Civ. 4191, 2003 WL 1622181, at *7 (S.D.N.Y. Mar. 28, 2003) (California law); CCBN.com, Inc. v. Thomson Financial, Inc., 270 F. Supp. 2d 146 (D. Mass. 2001) (Delaware law); U.S. Airways Group, Inc. v. British Airways PLC, 989 F. Supp. 482, 494 (S.D.N.Y. 1997) (Delaware law); Emerson Radio Corp. v. Int'l Jensen Inc., Civ. A. Nos. 15130, 14992, 1996 WL 483086 (Del. Ch., Aug. 20, 1996) (Delaware law). But see In re Papercraft Corp., 165 B.R. 980, 991 (Bankr. W.D. Pa. 1994) (under Pennsylvania law, applying respondeat superior liability to hold shareholder owed fiduciary duty to corporation), vacated on other grounds, 187 B.R. 486 (Bankr. W.D.Pa. 1995), rev'd on other grounds, 211 B.R. 813 (W.D. Pa. 1997). No court applying New York law has addressed this precise issue.

In U.S. Airways, the court noted that applying respondeat superior liability in this context "would completely undermine Delaware corporate law, which limits such fiduciary duty to majority and controlling shareholders." U.S. Airways, 989 F. Supp. at 494. Moreover, the court agreed with the court in Emerson that "[t]he notion that a stockholder could become a fiduciary by attribution (analogous to the result under the tort law doctrine of respondeat superior) would work an unprecedented, revolutionary change in [Delaware] law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors." Id., quoting Emerson, 1996 WL 483086 at *20 n.18.

While it is a plausible argument that, at least under certain circumstances, a fiduciary duty can be imputed to a shareholder based on the participation of its designee on the board of a corporation, the Court is hesitant to adopt such a novel and expansive conception of New York

fiduciary duty law, especially where the majority of courts to address the issue have rejected it, and where the only courts to address the policy implications of such an expansion urge caution. Cf. H.L. Hayden Co. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1025 (2d Cir. 1989) (rejecting novel claim under New York law where not grounded in any New York case and where recognizing claim could have negative policy consequences, stating "it is not the role of a federal court ruling in diversity to undertake such an expansion of New York law"); Howse v. Zimmer Mfg. Co. Inc., 757 F.2d 448, 451 (1st Cir. 1985) (noting "in diversity cases the federal courts do not undertake to restructure state law").

However, that does not mean that the direction or control that defendants are alleged to have exercised as to the board designees are irrelevant to this case. First, defendants' control or influence over the board designees may serve as evidence of their control over GC itself. See In re Tri-Star Pictures, Inc. Litig., 634 A.2d 319, 328-29 (Del. 1993) (holding minority shareholder controlled corporation where, inter alia, shareholder designated and had influence over board members). Second, New York law recognizes that a third party may be held liable as a principal for a fiduciary's breach of its duties under an "aiding and abetting" or "participation" theory. See S & K Sales v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1987) (participation); Moll v. U.S. Life Title Ins. Co., 654 F. Supp. 1012, 1030 (S.D.N.Y. 1987) (aiding and abetting); see also, e.g., CCBN, 270 F. Supp. 2d at 152 (rejecting respondeat superior claim but acknowledging potential aiding-and-abetting claim). Such theories are potentially viable in this case, where the complaint is rife with allegations that defendants induced, directed, and/or actively participated in the alleged breaches by the board designees, and indeed the complaint does assert an aiding and abetting claim. (Compl. ¶ 281; Pl. Mem.)

As to the aiding and abetting claim, defendants argue that the complaint fails to allege that they had actual knowledge of the alleged breaches, a necessary element of an aiding-and-abetting claim.  The Court agrees with the Estate Representative that knowledge is fairly implied by the nature of conduct alleged – self-dealing transactions and insider trading directly benefitting defendants – and by the complaint's express allegation that the designees' breaches were done at defendants' behest.  (Compl. ¶¶ 248, 254.)  While the evidence may ultimately not bear out the claim of actual knowledge, the Estate Representative has satisfied its pleading burden.[27]

Finally, the CIBC defendants assert in a supplemental memorandum that a recent decision by the Court, In re Global Crossing Securities Litigation, No. 02 Civ. 910, 2006 WL 1628469 (S.D.N.Y. June 13, 2006), provides an additional reason to dismiss such a theory.  In that case, the Court held that settlements struck with the defendants' board designees freed the defendants from liability, to the extent such liability was imputed based on the designees' conduct.  As the Estate Representative notes in its responsive memorandum, the Court's ruling was based on federal law, not the law of New York.  Because the Court rejects the respondeat superior theory of liability advanced in the complaint on other grounds, it need not address the

---

[27] The ULLICO defendants additionally argue that its designee, Michael Steed, breached no fiduciary duty to GC, relying primarily on the fact that the complaint alleges that Steed did not attend the board meetings at which the challenged transactions were approved, nor did he vote by proxy.  (ULLICO Mem. 20-25.)  Of course, if the evidence ultimately shows that Steed did not breach a duty to GC, because he had no involvement with the challenged transactions (voting or otherwise), the ULLICO defendants cannot be held liable on an aiding and abetting theory.  Whether there is such a failure of evidence, however, is a question to be addressed at the summary judgement stage.  See FDIC v. Bober, Nos. 95 Civ. 9529, 2000 WL 235271, at *1 (S.D.N.Y. Mar. 1, 2000) ("The issue of who bears more or less responsibility for the alleged improper transactions will get sorted out as the case moves through discovery and closer to trial.").

application of the <u>Global Crossing</u> reasoning to this case.

      E.  <u>GC's Bylaws</u>

In passing, defendants argue that a provision in GC's corporate charter precludes all of the fiduciary duty claims.  The Court disagrees.  The provision in question states that:

> Each Shareholder and the Company agree to waive any claim or right of action he or it may at any time have, whether individually or in the right of the Company, against any Director, Officer, or member of a committee duly constituted under Bye-Law 99 on account of any action taken by such Director, Officer or member of a committee to take any action in the performance of his duties with or for the Company; PROVIDED HOWEVER that such waiver shall not apply to any claims or rights of actions arising out of the fraud of such Director [or] Officer or to recover any gain, personal profit or advantage to which such Director [or] Officer is not legally entitled.

(Rodriguez Aff., Ex.B ¶ 144.)  Having rejected the Estate Representative's respondeat superior claims, this provision would appear to no longer be applicable to this action, since by its very terms it applies only to claims "against any Director, Officer, or member of a committee duly constituted under Bye-Law 99," and not shareholders such as defendants.  In any event, it is unclear that the exception to the waiver provision regarding actions to "recover any gain, personal profit or advantage" should be interpreted so narrowly as to distinguish between actions, such as this one, in which it is alleged that a corporate director appropriated property and funneled them to a third party (which under a narrow view of the provision are waived), and those where it is alleged that the employer appropriated property for himself (which are not).  For these reasons, the Court rejects any argument that the waiver provision requires dismissal of the fiduciary duty claims.

## III. Count IV: Corporate Waste under NYBCL § 720

The CIBC defendants, in a footnote, argue that Count 4, which among other things charges defendants with liability under N.Y. Bus. Corp. L. § 720 for corporate waste committed by the board designees, can only be asserted against the designees themselves and therefore should be dismissed.  (CIBC Mem. 38 n.14.)  The Estate Representative, also in a footnote, vehemently rejects this argument.  (Pl. Mem. 23 n.23.)  The Court will not address these arguments at this stage of the proceedings.  Cf. Diesel v. Town of Lewisboro, 232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review," quoting United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir.1993).

## IV. Count VI: Forfeiture of Compensation

In Count 6, the complaint alleges that because of defendants' breaches of fiduciary duty they "are required to forfeit all compensation, including investment opportunities and the value of opportunities to sell Global Crossing stock, which each defendant received after the first date upon which it or its designees breached their fiduciary duties or aided and abetted in the breach of fiduciary duties to Global Crossing."  (Compl. ¶ 281.)  In its opening memorandum, CCC argues that a forfeiture of compensation claim is appropriate only in the case of an employee who acts adversely to his employer's interests, and not in the context of an outside shareholder alleged to have breached (or to have aided and abetted a breach) a fiduciary duty to a corporation.  (CCC Mem. 10.)  See, e.g., Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003) (permitting forfeiture of compensation remedy in employee/employer context); Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 661 (S.D.N.Y. 2005).  The Estate

Representative fails to address this argument entirely, and the Court will therefore deem the request for forfeiture of compensation waived. Of course, this holding may ultimately be of little consequence considering that the forfeiture of compensation remedy substantially, if not entirely, overlaps with the other equitable remedies sought under the breach of fiduciary duty counts.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are denied in part and granted in part. Specifically, Count I is dismissed as untimely with respect to CCC, and with respect to the ULLICO defendants to the extent Count I relates to the US West merger and tender offer or the April 2000 secondary offering. Count I is also dismissed to the extent it attempts to avoid transfers of stock and opportunities to sell stock. Counts II-VII are dismissed to the extent they assert claims based on duties owed to GT Parent, and to the extent they assert fiduciary duty claims relating to the execution and termination of the ASA agreements. Finally, the forfeiture of compensation claim in Count VI is dismissed. The motions to dismiss are denied in all other respects. The Clerk of Court is respectfully directed to close defendants' motions (Dkt. Nos. 25, 68, 72) on all internal reports.

SO ORDERED.

Dated: New York, New York
      August 3, 2006

GERARD E. LYNCH
United States District Judge

49